Axos Fin., Inc. v Reception Purchaser, LLC (2026 NY Slip Op 50019(U))

[*1]

Axos Fin., Inc. v Reception Purchaser, LLC

2026 NY Slip Op 50019(U)

Decided on January 3, 2026

Supreme Court, New York County

Patel, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 3, 2026
Supreme Court, New York County

Axos Financial, Inc., SIEMENS FINANCIAL SERVICES, INC., Plaintiffs,

againstReception Purchaser, LLC, RECEPTION MEZZANINE HOLDINGS, LLC, STG DISTRIBUTION, LLC, STG DISTRIBUTION HOLDINGS, LLC, ANTARES CAPITAL LP, ANTARES ASSETCO LP, ANTARES CREDIT OPPORTUNITIES VI LLC, ANTARES CREDIT OPPORTUNITIES FUNDING VI LLC, ANTARES CREDIT OPPORTUNITIES MA II LP, ANTARES CREDIT OPPORTUNITIES CA LLC, ANTARES CREDIT OPPORTUNITIES CA SPV III LLC, ANTARES CREDIT FUND II LP, ANTARES STRATEGIC CREDIT I MASTER LP, ANTARES STRATEGIC CREDIT I SPV LLC, ANTARES SENIOR LOAN EF MASTER II (CAYMAN) LP, ANTARES SENIOR LOAN EF II SPV LLC, ANTARES SENIOR LOAN MASTER FUND II LP, ANTARES SENIOR LOAN PARALLEL FUND II SPV LLC, ANTARES SENIOR LOAN PARALLEL MASTER FUND II LP, ANTARES CREDIT FUND I LP, ANTARES HOLDINGS LP, ALCOF III NUBT, L.P., AUDAX SENIOR DEBT (WCTPT) SPV II, LLC, AUDAX SENIOR LOAN FUND I (OFFSHORE) SPV II, LTD., AUDAX SENIOR DEBT CLO 4, LLC, AUDAX SENIOR DEBT CLO 6, LLC, AUDAX CREDIT OPPORTUNITIES (SBA) SPV LLC, AUDAX SENIOR LOAN FUND V, L.P., AUDAX SENIOR DEBT CLO 8, LLC, AUDAX SENIOR DEBT CLO 9, LLC, AUDAX CREDIT BDC INC., THORNEY ISLAND LIMITED PARTNERSHIP, KNIGHTS OF COLUMBUS PRIVATE CREDIT FUND, LP, AUDAX SENIOR LOAN IDF FUND-E SPV II, LLC, AUDAX SD-A SPV, L.P., AUDAX SENIOR DEBT (PT), LLC, BALLYROCK CLO 20 LTD., BALLYROCK CLO 2018-1 LTD., BALLYROCK CLO 2020-2 LTD., AUDAX SENIOR DEBT CLO 7, LLC, BALLYROCK CLO 14 LTD., BALLYROCK CLO 15 LTD., BALLYROCK CLO 16 LTD., BALLYROCK CLO 17 LTD., BALLYROCK CLO 19 LTD., BALLYROCK CLO 2019-2 LTD., BALLYROCK CLO 18 LTD., BALLYROCK CLO 2019-1 LTD., IOF II ONSHORE FIRST LIEN, LLC, IOF II OFFSHORE FIRST LIEN, LLC, DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LTD, FORTRESS CREDIT BSL XVI LIMITED, FORTRESS CREDIT BSL XIX LIMITED, FORTRESS CREDIT BSL XV LIMITED, FORTRESS CREDIT BSL IX LIMITED, FORTRESS CREDIT BSL III LIMITED, FORTRESS CREDIT BSL VI LIMITED, FORTRESS CREDIT BSL VII LIMITED, FORTRESS CREDIT BSL VIII LIMITED, FORTRESS CREDIT BSL X LIMITED, FORTRESS CREDIT BSL XI LIMITED, FORTRESS CREDIT BSL XII LIMITED, FORTRESS CREDIT BSL XIII LIMITED, FORTRESS CREDIT BSL XIV LIMITED, FORTRESS CREDIT BSL XVII LIMITED, FORTRESS CREDIT BSL XVIII LIMITED, FORTRESS CREDIT OPPORTUNITIES IX CLO LIMITED, FORTRESS CREDIT OPPORTUNITIES XI CLO LIMITED, FORTRESS CREDIT OPPORTUNITIES XIX CLO LLC, FORTRESS CREDIT OPPORTUNITIES XV CLO LIMITED, FORTRESS CREDIT OPPORTUNITIES XXI CLO LLC, FORTRESS CREDIT OPPORTUNITIES VIII CLO LLC, FDF III LIMITED, FDF IV LIMITED, FDF V LIMITED, FLF III-IV MA-CRPTF HOLDINGS FINANCE L.P., FLF III AB HOLDINGS FINANCE L.P., FLF III BAM HOLDINGS FINANCE L.P., FIDELITY CENTRAL INVESTMENT PORTFOLIOS LLC, FIDELITY FLOATING RATE CENTRAL FUND, FIDELITY INCOME FUND, FIDELITY ADVISOR SERIES, FIDELITY SALEM STREET TRUST, VARIABLE INSURANCE PRODUCTS FUND, FIDELITY MERRIMACK STREET TRUST, FIDELITY PRIVATE CREDIT FUND, JNL/PPM AMERICA FLOATING RATE INCOME FUND, FIAM LEVERAGED LOAN LP, JNL/FIDELITY INSTITUTIONAL ASSET MANAGEMENT TOTAL BOND FUND, FIAM FLOATING RATE HIGH INCOME COMMINGLED POOL, FIDELITY INFLATION-FOCUSED FUND, FIDELITY FLOATING RATE HIGH INCOME MULTI-ASSET BASE FUND, FIDELITY FLOATING RATE HIGH INCOME FUND, FIDELITY DIRECT LENDING FUND I JSPV LLC, BLUE EAGLE 2022-1B, LLC, BLUE EAGLE 2022 - 1C, LLC, HARBOURVIEW CLO VII-R, LTD., INVESCO CREDIT PARTNERS MASTER FUND III, LP, INVESCO SAKURA US SENIOR SECURED FUND, INVESCO SSL FUND LLC, INVESCO ZODIAC FUNDS - INVESCO EUROPEAN SENIOR LOAN ESG FUND, INVESCO ZODIAC FUNDS - INVESCO EUROPEAN SENIOR LOAN FUND, INVESCO ZODIAC FUNDS - INVESCO US SENIOR LOAN ESG FUND, INVESCO ZODIAC FUNDS - INVESCO US SENIOR LOAN FUND, INVESCO DYNAMIC CREDIT OPPORTUNITY, INVESCO FLOATING RATE ESG FUND, INVESCO FLOATING RATE INCOME FUND, INVESCO SENIOR FLOATING RATE FUND, INVESCO CLO 2022-1, LTD., INVESCO CLO 2022-2, LTD., INVESCO CLO 2022-3, LTD., INVESCO U.S. CLO 2024-1, LTD., INVESCO U.S. CLO 2021-2, LTD., INVESCO CLO 2021-3, LTD., ANNISA CLO, LTD., BARDOT CLO, LTD., BETONY CLO 2, LTD., MILOS CLO, LTD., RISERVA CLO LTD., VERDE CLO, LTD., ALINEA CLO, LTD., INVESCO CLO 2021- 1, LTD., RECETTE CLO, LTD., UPLAND CLO, LTD., INVESCO CREDIT PARTNERS OPPORTUNITIES FUND 2023, L.P., INVESCO PEAK NINE, L.P., DIVERSIFIED CREDIT PORTFOLIO LTD., SENTRY INSURANCE COMPANY, INVESCO TETON FUND LLC, ISQ INFRASTRUCTURE CREDIT FUND U.S. POOLING II, L.P., PA SENIOR CREDIT OPPORTUNITIES FUND, L.P. (ON BEHALF OF ITS UNLEVERED SERIES), PENNANTPARK INVESTMENT CORPORATION PENNANTPARK CREDIT OPPORTUNITIES FUND IV AGGREGATOR, LP, PENNANTPARK CLO III, LTD, PENNANTPARK CLO V, LLC, PENNANTPARK CLO VII, LLC, PENNANTPARK CLO VI, LLC, PRUDENTIAL HONG KONG LIMITED, JNL/PPM AMERICA FLOATING RATE INCOME FUND, A SERIES OF THE JNL SERIES TRUST, BLUEMOUNTAIN CLO 2014-2 LTD., BLUEMOUNTAIN CLO 2015- 3 LTD., BLUEMOUNTAIN CLO 2015-4 LTD., BLUEMOUNTAIN CLO 2016-2 LTD., BLUEMOUNTAIN CLO 2016-3 LTD., BLUEMOUNTAIN CLO 2018-1 LTD., BLUEMOUNTAIN CLO 2018-2 LTD., BLUEMOUNTAIN CLO 2018-3 LTD., BLUEMOUNTAIN CLO XXII LTD., BLUEMOUNTAIN CLO XXIII LTD., BLUEMOUNTAIN CLO XXIV LTD., BLUEMOUNTAIN CLO XXIX LTD., BLUEMOUNTAIN CLO XXV LTD., BLUEMOUNTAIN CLO XXVI LTD., BLUEMOUNTAIN CLO XXVIII LTD., BLUEMOUNTAIN CLO XXX LTD., BLUEMOUNTAIN CLO XXXI LTD., BLUEMOUNTAIN CLO XXXII LTD., BLUEMOUNTAIN CLO XXXIII LTD., BLUEMOUNTAIN CLO XXXIV LTD., BLUEMOUNTAIN CLO XXXV LTD., BLUEMOUNTAIN FUJI US CLO I LTD., BLUEMOUNTAIN FUJI US CLO II LTD., BLUEMOUNTAIN FUJI US CLO III LTD., PA SENIOR CREDIT FUNDING SPV, LLC, PROSPECT CAPITAL CORPORATION, CITIZENS BANK, NATIONAL ASSOCIATION, DEUTSCHE BANK AG, LONDON BRANCH, DEUTSCHE BANK AG, NEW YORK BRANCH, Defendants.

Index No. 650108/2025

Counsel for Plaintiffs: Jennifer M. Selendy, Esq., David A. Coon, Esq., and Dominic Vincent Budetti, Esq. of Selendy Gay PLLC.
Counsel for Defendant STG Distribution LLC, and related Defendant entities: Joshua M. Greenblatt, Esq., Jeffrey Ross Goldfine, Esq., Vanessa Di Feo, Esq., Barbara Samantha Helgason, Esq., Patrick Robert Lyons, Esq., and Michael Whalen, Esq. of Kirkland & Ellis LLP.
Counsel for Defendant Antares Capital LP, and related Defendant entities: Elliot Moskowitz, Esq., Adam Miles Greene, Esq. of Davis Polk & Wardwell LLP.
Counsel for Defendant Lenders: Christopher L. Wilson, Esq., and Nicholaus Christopher Mills, Esq. of Gibson Dunn & Crutcher LLP.
Counsel for Defendant Sentry Insurance Company: Aaron Maurice Saykin, Esq. of Hodgson Russ LLP, and Katherine Anne Garceau, Esq. of Croke Fairchild Duarte & Beres LLC.

Anar Rathod Patel, J.

The following e-filed documents, listed by NYSCEF document number (Motion 004) 63, 75—80, 82, 118, 147, 151, 158, 161 were read on this motion to DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 005) 64—70, 84—85, 95, 143—144, 150, 152, 159 were read on this motion to DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 006) 71—74, 123, 149, 153, 160 were read on this motion to DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 007) 81, 83, 86—94, 96—97, 148, 154, 157, 231—232 were read on this motion to DISMISS.
Seldom does a sponsor-financed debt restructuring contain as many discrete legal issues as the instant case both with respect to credit agreements generally, and with respect to the emerging body of jurisprudence related to Liability Management Transaction(s) ("LMT" or [*2]"LMTs") more specifically. This dispute involves STG Logistics ("STG"), a portfolio company of Oaktree Capital Management and Wind Point Partners (the "Equity Sponsors"), and the lending group which was originally united as lenders but became divided after a majority of the lenders (the "Majority Lenders") effectuated an LMT. An LMT comes in different permutations and refers to a series of financial maneuvers undertaken by a highly leveraged company in financial distress to restructure, refinance, or otherwise modify its existing indebtedness. Typically, LMTs are pursued to inject capital, improve liquidity, reduce near-term payment obligations, and provide covenant relief. An LMT disunites similarly situated lenders by dividing them into two or more classes, then structuring more favorable terms for one class of lenders—usually the majority—and transferring bargained-for value away from the unfavored class—usually the minority. The favored lenders obtain benefits such as senior secured priority in the capital stack, greater collateral protection, stronger guaranty protection, and repayment priority in a bankruptcy. Such actions have been referred to colloquially as "lender-on-lender violence," although a more appropriate—and less dramatic—description is "lender bullying." Accordingly, LMTs can give rise to fierce disputes and litigation among lender classes.
Here, Plaintiffs Axos Financial, Inc., and Siemens Financial Services, Inc. (collectively, "Plaintiffs" or "Axos") allege a calculated plot perpetrated by Defendants,[FN1]
comprised of STG, the Majority Lenders, and Administrative Agent Antares Capital LP ("Antares Capital")[FN2]
, to deprive Plaintiffs of their contractual rights. Plaintiffs allege that in October 2024, a slight majority of the loan holders essentially formed their own "syndicate-within-the-syndicate" through which they planned and executed an LMT (the "October Transaction" or the "Scheme"). AC at ¶¶ 73, 82. Plaintiffs allege that the LMT involved a complex series of inter-related steps including: (1) amending the credit agreement governing the loans held by Plaintiffs and Defendant lenders (the "Defendant Lenders"[FN3]
); (2) the creation of unrestricted borrower subsidiaries, Defendants STG Distribution LLC and STG Distribution Holdings LLC (together, "UnSub"); (3) the transfer of valuable collateral assets from STG to UnSub; (4) the full prepayment of loans held by Defendant Lenders; (4) the extension of loans by Defendant Lenders to UnSub, many of which were secured by the assets of UnSub and guaranteed by the assets of STG; and (5) the issuance of a secured intercompany loan from UnSub to STG in an amount equal to the new debt financing issued to UnSub. 
Plaintiffs allege that the October Transaction was accomplished through the contemporaneous execution of three mutually dependent agreements: the Sixth Amendment to Credit Agreement and Second Amendment to Guaranty and Security Agreement (NYSCEF Doc. No. 89) (the "SAA"), the Dropdown Credit Agreement (NYSCEF Doc. No. 91) (the "Dropdown Agreement"), and the Intercompany Credit Agreement (NYSCEF Doc. No. 93) (the "Intercompany Agreement"). Plaintiffs allege that the October Transaction breached the governing "Fifth Amendment to Credit Agreement and First Amendment to Guaranty [a]nd Security Agreement" (NYSCEF Doc. No. 87) (the "FAA")[FN4]
, including provisions expressly drafted to insulate Plaintiffs against such an LMT. Plaintiffs also allege that the Majority Lenders unlawfully adopted the SAA, which contained few protections for the other lenders (the "Minority Lenders"). Although Defendants argue that the October Transaction was executed pursuant to provisions in the validly adopted SAA, Plaintiffs argue that absent the guardrails of a meaningful credit agreement protecting all lenders, the Majority Lenders were left unpoliced with the ability to design self-serving loans without resistance. Ultimately, in a subsequent transaction, the Majority Lenders offered the Minority Lenders loans that had greater risk and a lower return than the loans held by the Majority Lenders. 
Plaintiffs commenced this action by filing the Summons and Complaint on January 8, 2025, and an Amended Complaint on January 30, 2025. NYSCEF Doc. Nos. 1—2 (Summons and Complaint), 14 (Amended Complaint). Plaintiffs allege ten causes of action for breach of contract against STG (Counts II—XI); two causes of action for breach of contract against Antares (Counts II and XI); one cause of action for breach of the implied covenant of good faith and fair dealing against Antares, STG, and Defendant Lenders (Count XII); and one cause of action for violation of New York's Uniform Voidable Transactions Act against STG and its newly formed subsidiaries (Count XIII). Plaintiffs additionally seek a declaratory judgment that the SAA is not a valid and enforceable contract (Count I). AC ¶¶ 139—261. Plaintiffs ask this Court to either unwind the October Transaction by finding the SAA null and void, or, in the alternative, to remunerate Plaintiffs for damages to their loan holdings caused by the Scheme. Id. 
Before the Court are four Motions to Dismiss the Amended Complaint pursuant to CPLR §§ 3211(a)(1), (3), and (7). The Court held oral argument on August 12, 2025. NYSCEF Doc. No. 196 (8/12/25 Tr.). Defendant Lenders move to dismiss Counts I and XII of the Amended Complaint (Mot. Seq. 004) arguing that (1) Plaintiffs lack standing pursuant to CPLR § 3211(a)(3) under the Agreement's No-Action Provision; (2) the allegations fail to state a claim because the October Transaction complied with all operative terms of the governing credit documents; (3) Count I is duplicative of the breach of contract claims; and (4) Count XII is duplicative of the breach of contract claims. NYSCEF Doc. No. 82 at 10—11 (Def. Lenders Mem. of Law).
Defendants STG and UnSub move to dismiss the entirety of the Amended Compliant (Mot. Seq. 007) arguing that (1) Plaintiffs lack standing pursuant to CPLR § 3211(a)(3); (2) the breach of contract claims fail to state a claim because the October Transaction complied with all operative terms of the governing credit documents; (3) Count I is duplicative of the breach of contract claims; (4) Count XII is duplicative of the breach of contract claims; and (5) Count XIII [*3]asserts claims under New York law instead of Illinois law and therefore must be dismissed. NYSCEF Doc. No. 96 at 7—8 (STG's Mem. of Law).
Defendant Antares moves to dismiss Counts I, II, XI, and XII of the Amended Complaint (Mot. Seq. 006) arguing that (1) Plaintiffs lack standing pursuant to CPLR § 3211(a)(3); (2) the allegations fail to state a claim because the October Transaction complied with all operative terms of the governing credit documents; (3) Count I is duplicative of the breach of contract claims; and (4) Count XII is duplicative of the breach of contract claims. NYSCEF Doc. No. 123 at 6—8 (Antares' Mem. of Law). Antares, as Administrative Agent, further argues that Plaintiffs exculpated them from all liability. Id. at 16.
Defendant Sentry Insurance Company ("Sentry") moves to dismiss Counts I and XII of the Amended Complaint (Mot. Seq. 005) both for the reasons cited by Defendant Lenders and because it cannot be held liable for breach of implied covenant of good faith and fair dealing where Invesco Senior Secured Management ("Invesco") acted as their discretionary investment advisor and was contractually responsible for all decisions related to the STG loans. NYSCEF Doc. No. 95 at 4—5 (Sentry Mem. of Law).
For the reasons set forth herein, Defendants' Motions to Dismiss are granted in part and denied in part. The Motions to Dismiss Count I for declaratory judgment are denied because the cause of action is not duplicative of any other cause of action pleaded in the Amended Complaint. The Motions to Dismiss Counts II—XI for breach of contract are denied because Plaintiffs pleaded those causes of action pursuant to violations of the FAA, and the Court cannot determine—at this juncture—whether the FAA or the SAA is the operative agreement governing the October Transaction. Notably, each breach of contract count involves a textual change between the relevant provisions of the FAA and the SAA.[FN5]
The Motions to Dismiss Count XII for breach of the implied covenant of good faith and fair dealing are denied, as the cause of action rests on conduct separate from that underlying the breach of contract claims. The Motion to Dismiss Count XIII for violation of New York's Uniform Voidable Transactions Act (the "UVTA") is granted because the fraudulent transfer claims pleaded under New York Law do not apply to the October Transaction. The Court further holds that the exculpation provision of the Agreement with exceptions for "gross negligence and willful misconduct" does not support dismissal where the Amended Complaint sufficiently alleges that Antares, in its capacity as Agent, participated in the Scheme. Finally, the Court determines that, because the declaratory [*4]judgment and implied covenant claims arise out of a contractual relationship, the claims against Sentry cannot be dismissed.Relevant Factual [FN6] and Procedural Background
The Initial Loan
STG is a North American company that provides integrated transportation logistics services. STG entered into a syndicated lending transaction for acquisition financing governed by a March 24, 2002 Credit Agreement (the "Credit Agreement"). AC at ¶¶ 5—6. The transaction involved $725 million in term loans and two tranches of revolver loans totaling $150 million from syndicating banks, that were eventually sold to a broad group of investors. Id. In 2002, shortly after the initial syndication, Plaintiff Axos' predecessor-in-interest, Axos Bank, purchased term loans and Plaintiff Siemens purchased term and revolver loans governed by the Credit Agreement. Id. ¶ 5. During the relevant period, Defendant Antares Capital LP was the administrative and collateral agent pursuant to the Credit Agreement, and sixteen other Antares entities participated as lenders through secondary market transactions. Id. at ¶¶ 26—27. 
Under the Credit Agreement, all the loans originally had a first-lien position and enjoyed equal collateral protection. Id. at ¶ 6. All lenders were to share equally in the risk and benefits of the loans. Id. Pursuant to the Credit Agreement, any loan pre-payments must be distributed pro rata, and any additional debt STG subsequently incurred must be either pari passu with, or junior to, the existing lenders in priority. Id. Additionally, the Credit Agreement contained affirmative and negative covenants including restrictions on STG's ability to incur new debt and dispose of assets. Id.
The May Transaction and Adoption of the FAA
In 2024, STG experienced a decline in financial performance resulting in liquidity constraints that required restructuring to provide temporary financial relief. Id. at ¶¶ 7—8. The Equity Sponsors enhanced STG's liquidity by infusing $30 million of additional equity capital. Id. at ¶ 8. On May 1, 2024, a majority of lenders voted to adopt the FAA (the "May Transaction") that relieved near-term pressure on STG by providing seven calendar quarters of relief [FN7]
from their maximum leverage ratio covenant. Id. In return, STG added additional lender protections to the FAA including a prohibition on future debt restructurings via non-pro-rata transactions, and collateral transfers to unrestricted subsidiaries. Id. STG's lenders were sophisticated participants in the syndicated loan market and understood that continued financial deterioration might result in an LMT that would likely favor the holdings of Majority Lenders to the detriment of Minority Lenders. Id. at ¶¶ 1—3, 8—11. The May Transaction served as a temporary solution to avoid bankruptcy until the stakeholders could devise a long-term plan for STG's continued viability. Id. at ¶ 9. 
The Majority Lenders approved several textual changes to the terms of the Credit Agreement in adopting the FAA, which, inter alia:
• Prohibit "using unrestricted subsidiaries by removing 'Unrestricted Subsidiary' as a [*5]defined term in the Agreement", exclude certain STG subsidiaries from the definition of "Excluded Subsidiary" to ensure those subsidiaries are subject to obligations and requirements within the FAA, and remove exemptions for "Unrestricted Subsidiaries" from certain negative covenants. Id. at ¶ 76; see FAA §§ 6.1—6.6, 6.8—6.9, 6.12—6.14, 6.16. • Place constraints on non-guarantor restricted subsidiaries that prevent their release as guarantors of existing loans and require that any transaction requiring the release of a subsidiary guaranty must be for "a bona fide business purpose", and the "primary purpose" could not be "to obtain the release of such obligations" to the existing loans. AC at ¶ 77; see FAA § 9.10. • Provide that no "Credit Party shall . . . assign or transfer, any Material Property to a Subsidiary that is not a Credit Party" preventing the debtor from transferring valuable assets to unrestricted subsidiaries.[FN8]AC at ¶ 78; see FAA § 6.18.
• Tighten certain negative covenants to further restrict STG and any subsidiaries from engaging in activities that would increase lender risk such as incurring liens or additional indebtedness, disposing of assets, or making restricted payments. AC at ¶ 79; see FAA §§ 6.1—6.6, 6.8.• Reaffirm and strengthen sacred rights provisions [FN9]protecting lenders from non-pro-rata LMTs, including prohibitions on non-pro-rata prepayments of existing loans or issuance of any obligations taking "priority over any of the [current loan] Obligations." Consent of all lenders "directly and adversely affected" is required to "change or have the effect of changing the priority or pro-rata treatment of any payments" including voluntary or mandatory pre-payments. AC at ¶ 80 (emphasis added); see FAA §10.1(a)(iv)(A); 8/12/25 Tr. at 4—16.
• State that lenders are "directly and adversely affected" if they do not "receive the most-favorable treatment . . . including the opportunity to participate on a pro-rata basis on the same terms in any new loans or other indebtedness permitted to be issued." AC at ¶ 80; see FAA § 10.1(a). Plaintiffs allege that Section 10.1 of the FAA shields and enhances their sacred rights because STG could not, without the consent of all directly and adversely affected lenders: (1) postpone interest payments (§ 10.1(a)(ii)); (2) reduce the principal amount of the lenders' loans through non-pro-rata prepayments (§ 10.1(a)(iii)); (3) change, or have the effect of changing, the priority or pro-rata treatment of the loans (§ 10.1(a)(iv)(A)); (4) release substantially all collateral securing the loans; (§ 10.1 (a)(vii)); or (5) subordinate lenders' existing loans, liens, or any or all portion of the obligations for indebtedness (§ 10.1(a)(viii)). AC at ¶¶ 104—117.
[*6]Financial Condition of STG Continues to Deteriorate
Plaintiffs knew that the financial condition of STG had declined; however, they took comfort in their sacred right protections, coupled with the newly-enacted, lender-friendly FAA amendments that "explicitly restricted STG and the Equity Sponsors from launching certain types of LMTs in the future."[FN10]
Id. at ¶¶ 75, 82. Although most provisions in the FAA could be changed with a Majority Lender vote, pursuant to FAA Section 10.1(a), any change in a sacred right that adversely impacted a lender required the consent of each "directly and adversely affected lender." Id. at ¶ 15; 8/12/25 Tr. at 4—16. In August 2024, STG released its second quarter financial results confirming the downward financial trajectory. AC at ¶¶ 10, 83. After the earnings release, it "became difficult" for Plaintiffs to get any information from STG, Antares Capital, or the Equity Sponsors. Id. at ¶¶ 10, 85. Antares Capital had previously "performed its obligations as Agent by keeping all lenders abreast of the company's performance . . ." Id. However, unbeknownst to Plaintiffs, STG, a majority of the lending group, Antares Capital, and the Equity Sponsors had signed a non-disclosure agreement ("NDA") and were devising the Scheme. Id. at ¶¶ 10—11, 86. 
Plaintiffs allege that "STG had no intention of honoring the FAA's protections against non-pro-rata LMTs." Id. at ¶ 82. Instead, STG and other parties agreed to the newly granted lender protections under the FAA in bad faith to provide STG a "temporary financial runway" while it was secretly intending to eliminate those provisions as needed to restructure its debt in the future on "better terms than those for which it had actually bargained." Id. Upon communicating with Antares Capital, Plaintiffs discovered that Antares Capital had executed an NDA relating to "secret negotiation[s] occurring among STG, the Equity Sponsors, and certain Defendant Lenders." Id. at ¶ 86. 
The October Transaction
On October 3, 2024, STG restructured its debt with a Majority Lender vote pursuant to the "three integrated, mutually dependent agreements . . . the [SAA], the Dropdown Credit Agreement, and the Intercompany Credit Agreement . . . ." Id. at ¶¶ 11—87. Only the Majority Lenders participated in the October Transaction, thereby excluding Plaintiffs and the other Minority Lenders, in violation of their bargained-for rights of ratable treatment for lenders holding similarly situated loans. Id. ¶¶ 92—93, 95. The Scheme involved multiple distinct, yet interconnected, steps. Id. at ¶ 11. First, the Majority Lenders removed lender protections by amending the text of the FAA, including changes to sacred rights. Id. at ¶ 11; 8/12/25 Tr. 59:11—19. Then, STG established unrestricted subsidiaries and subsequently transferred substantially all of STG's assets into them, thereby removing those assets from the existing collateral pool. AC at ¶ 11. The Majority Lenders exchanged their existing loans through a prohibited non-pro-rata transaction, at a premium to market trading prices of the loans. Id. Pursuant to the Dropdown Agreement, as the Majority Lenders exchanged existing loans, new loans were simultaneously issued by the Majority Lenders to UnSub, backed by the collateral and guarantees at both STG and UnSub. Id. This transaction refinanced all the outstanding debt of the Majority Lenders, and provided an additional $137 million of debt capital to STG. Id. [*7]Finally, all loan proceeds were lent upstream from UnSub to parent STG pursuant to the Intercompany Agreement. Id. 
The Majority Lenders used two types of LMTs known as "dropdown" and "double dip" transactions. A dropdown transaction subordinates existing lenders by moving collateral assets to an unrestricted subsidiary outside the governance of the current credit agreement and beyond the reach of current lenders. Assets within the unrestricted subsidiary only provide collateral support for newly issued loans to favored lenders to the detriment of the original loan holders. Id. at ¶¶ 57—59. To create a "double dip", the unrestricted subsidiary transfers the loan proceeds received from the favored lenders to the parent company through an intercompany loan. Id. at ¶ 58. The result of the entire transaction situates the favored lenders with the benefit of a first-lien security interest in all unrestricted subsidiary assets, and two first-lien claims on the parent assets consisting of the intercompany loan and the guaranty of the parent company, thereby providing two secured lender claims against STG securing the loans issued to the Majority Lenders.
Plaintiffs allege that the October Transaction caused them direct harm and had an adverse impact on their loan holdings. In addition to a reduction in market value, the October Transaction (1) transferred assets to UnSub that resulted in existing loans held by the Minority Lenders losing their lien and guaranty on those assets; (2) diluted the Minority Lenders' liens on assets remaining at STG because of the pari passu first-lien guarantee of the UnSub loans and the UnSub first-lien intercompany loan; and (3) eliminated nearly all covenants, nearly all events of default, mandatory pre-payments, and STG's obligation to make scheduled pre-maturity interest payments. Id. at ¶¶ 13, 60. 
The Scheme Violated Sacred Rights of Minority Lenders
Plaintiffs allege that the Scheme violated their "sacred rights" pursuant to Section 10.1(a) of the FAA by, inter alia, (1) depriving them of their right to receive pre-maturity interest payments (id. at ¶ 106); (2) pre-paying some existing loans, thereby reducing the principal of outstanding loans (id. at ¶ 108); (3) transferring existing loan collateral to newly created unrestricted subsidiaries (id. at ¶ 110); (4) subordinating Plaintiffs' loans to those of other lenders with respect to collateral priority (id. at ¶ 112); and (5) altering existing amendments with respect to pro rata lender treatment in a repayment waterfall (id. at ¶¶ 114). Additionally, Plaintiffs allege that the SAA eliminated almost every negative covenant, most affirmative covenants, and events of default. Id. at ¶¶ 88—89. Plaintiffs further allege that STG's obligation to make scheduled interest payments was replaced with STG's discretion to pay deferred interest at loan maturity without triggering an event of default. Id. at ¶¶ 105—106.
Specifically, Plaintiffs allege that the Scheme breached key provisions of the FAA, to wit:
• § 2.10(a) requiring "all payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required . . . be made to the Agent and for the ratable account of the Persons holding the applicable Obligations." Plaintiffs allege that Defendants breached this provision by prepaying loans of the Majority Lenders in a non-pro-rata transaction and then failing to make a ratable distribution to all lenders. Id. at ¶¶ 157—60.• § 6.1 requiring that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property." Plaintiffs allege that Defendants breached this provision prohibiting liens by allowing UnSub to both incur [*8]direct debt and to make an intercompany loan to STG. Id. at ¶¶ 88, 169—70. • § 6.2 providing that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, Dispose of (whether in one or a series of transactions) any Property" unless such disposal is a permitted exception pursuant to Section 6.2. Plaintiffs allege that Defendants breached this provision by transferring two STG business units to UnSub. Id. ¶¶ 88, 177—78. • § 6.3 providing that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to merge with, consolidate with or into, dissolve or liquidate into or convey, transfer, lease or otherwise dispose of . . . all or substantially all of its assets" unless an exception applies to the transaction pursuant to § 6.3. Plaintiffs allege that Defendants breached this provision by transferring two STG business units to UnSub "representing all or substantially all of its assets." Id. at ¶¶ 88, 185—86. • § 6.5 requiring that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness" other than for permitted purposes in § 6.5. Plaintiffs allege that Defendants breached this provision by allowing UnSub to incur direct debt from the Majority Lenders, and STG to incur direct debt from UnSub. Id. at ¶¶ 88, 193—94. • § 6.6 providing that "[n]o Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to . . . enter into any transaction with any Sponsor or any Affiliate of any Sponsor, of the Borrowers or of any such Subsidiary" unless the transaction is permitted pursuant to § 6.6. Plaintiffs allege that Defendants breached this provision by transferring assets from STG to UnSub, loaning funds from UnSub to STG, and providing a guaranty from STG to UnSub. Id. at ¶¶ 88, 201—02. • § 6.18 providing that "[n]o Credit party shall, and no Credit Party shall permit any of its Subsidiaries to make any Investment, Restricted Payment, or Disposition of, or otherwise assign or transfer, any Material Property to a Subsidiary that is not a Credit Party." Plaintiffs allege that Defendants breached this provision by transferring two valuable and material business units from STG to UnSub. Id. at ¶¶ 88, 209—10. • § 2.7 providing that STG's "[o]ptional party prepayments of Revolv[er] Loans shall be applied . . . in accordance with Section 2.10(a)" (pro rata), and "[o]ptional partial prepayments of Term Loans shall, subject to § 2.10(a), be applied" (pro rata) according to STG's "notice of prepayment and, in the absence of such direction, in the manner set forth in Section 2.8(f)." Plaintiffs allege that Defendants breached this provision by prepaying the Majority Lenders in violation of the waterfall provisions in Section 2.8(f). Additionally, the prepayments were not "Discounted Buybacks" as permitted under Section 2.7. Id. at ¶¶ 217—20. • § 2.8(d) providing that "[p]romptly upon receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the incurrence of indebtedness," STG must deliver "an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with Section 2.8(f)." Plaintiffs allege that Defendants breached this provision by allowing UnSub to receive $137 million in net issuance loan proceeds and failing to distribute it to the original lenders. Id. at ¶¶ 227—28. • § 2.10(c) providing that "[d]uring the continuance of an Event of Default . . . all payments received by the Agent . . . shall be applied" in an order specified in § 2.10(c). [*9]Pursuant to § 8.1(c), an Event of Default occurs upon any failure by a Credit Party to "perform or observe any term, covenant or agreement" reflected in Article VI. Plaintiffs allege that Defendants breached this provision by allowing Events of Default to occur pursuant to §§ 6.1, 6.2, 6.3, 6.5, 6.6, and 6.18, and failed to distribute payments as required by the waterfall mandated in Section 2.10(c). Id. at ¶¶ 88, 236—38.Plaintiffs argue the Scheme materially changed most sacred rights in the FAA without the consent of all directly and adversely affected lenders as required under Section 10.1(a). Id. at ¶ 15. The Scheme could not have been accomplished without execution of the SAA because after adoption of the SAA, the Scheme participants engaged in actions that would have violated numerous provisions in the FAA. Id. at ¶¶ 102—103. The damage borne to Plaintiffs occurred incrementally after adoption of the SAA. Plaintiffs argue that, through each purposeful step, the Scheme participants systematically removed collateral protections, structurally subordinated their loans, and eliminated any official recourse Plaintiffs had to actively monitor STG through covenant compliance. 
Second Loan Offering to Minority Lenders
Although barred from participating in the October Transaction alongside the Majority Lenders, Plaintiffs allege that they, and the other Minority Lenders, were instead invited to exchange their existing structurally subordinated loans for new loans in a second offering. Id. at ¶¶ 11, 93. Plaintiffs contend that the new loans offered had materially different, and inferior, terms to those held by the Majority Lenders, including, inter alia, a deeper exchange discount to par, less collateral coverage, inferior payment priorities, and a lower interest rate. Id. at ¶¶ 1, 6, 100—01. Plaintiffs allege that the Scheme forced the participating Minority Lenders to sign an NDA that precluded them from discussing either the October Transaction or the second loan offering with each other to curtail any coordinated challenges. Id. at ¶ 11. Plaintiffs also allege that the second loan offering contained a contingency whereby the participating Minority Lenders must represent that they would release all legal claims related to the October Transaction. Id. at ¶ 11. All the Minority Lenders, except for Plaintiffs, participated in the second loan offering. Id. at ¶ 13.
Role of Antares Capital
Plaintiffs allege that Antares Capital, as Agent, owed obligations to the entirety of the lending group, including providing regular financial updates on STG, advising on STG's covenant compliance, sharing any material developments, and ensuring that loan parties abide by their respective obligations. Id. at ¶ 70. Antares Capital instead worked with a select group of lenders from which Plaintiffs were purposely excluded, despite expressing a desire to be part of any restructuring committee. Id. at ¶ 73. Plaintiffs argue that Antares Capital "abandoned the duty it owed to all lenders as Agent to instead collude with a select group of lenders and devise a Scheme at the expense of others." Id. at ¶ 86. 
Legal Discussion
Pursuant to CPLR § 3211(a)(7), the "pleadings are to be afforded a liberal construction, allegations are taken as true, the plaintiff is afforded every possible inference, and a determination is made only as to whether the facts as alleged fit within any cognizable legal theory." CSC Holdings, LLC v. Samsung Elecs. Am., Inc., 146 N.Y.S.3d 17, 18 (1st Dept. 2021) (internal citations omitted). Nevertheless, "[d]ismissal of the complaint is warranted if the plaintiff fails to assert facts in support of an element of the claim, or if the factual allegations and inferences drawn from them do not allow for an enforceable right of recovery." Connaughton v. [*10]Chipotle Mexican Grill, Inc., 29 NY3d 137 (2017) (internal citations omitted). The test is "whether the proponent of the pleading has a cause of action, not whether he has stated one." Leon v. Martinez, 84 NY2d 83, 87—88 (1994). Courts will grant a motion to dismiss where the plaintiff states a cognizable cause of action but fails to assert a material fact necessary to meet an element of the claim. See, e.g., Arnon Ltd v. Beierwaltes, 3 N.Y.S.3d 31, 33 (2015).
On a motion to dismiss, "[a] party may move for judgment dismissing one or more causes of action asserted against him on the ground that a defense is founded upon documentary evidence." CPLR § 3211(a)(1). Documentary evidence, "such as an unambiguous contract," must "conclusively establish [ ] a defense to the asserted claims as a matter of law." Behler v. Tao, 43 NY3d 343, 348 (2025) (quoting Goldman v. Metropolitan Life Ins. Co., 5 NY3d 561, 571 (2005)).
Dismissal pursuant to CPLR § 3211(a)(3) is warranted where "the party asserting the cause of action" does not possess "legal capacity to sue." 
I. No Action Provision Does Not Bar Plaintiffs' Claims
Defendants argue, as a threshold matter, Plaintiffs lack standing to assert their claims pursuant to CPLR § 3211(a)(3) because the no-action clause in Section 9.3(c) of the Agreement vests Antares Capital, as the Administrative Agent, with the exclusive authority to enforce all rights and remedies under the Agreement. See Antares Mem. of Law at 15—16; STG Mem. of Law at 14—17; Def. Lenders Mem. of Law at 11—13. The relevant language of Section 9.3(c) states:
Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Secured Parties . . . (emphasis added).Defendant Lenders rely upon the "[n]otwithstanding anything to the contrary" language to establish that it was clear and unambiguous to all parties that "the No Action Provision applies to every covered claim, without exception." NYSCEF Doc. No. 161 at 7 (Def. Lenders Reply). It is undisputed that Plaintiffs did not make any demand upon Antares Capital to enforce their rights or seek any remedies that are the subject of this action. Therefore, Defendants contend that without the consent of Antares Capital, Plaintiffs lack standing to sue. The Court does not credit Defendants' argument. 
Dismissal pursuant to CPLR § 3211(a)(3) is warranted where "plaintiffs lack standing to sue due to their failure to comply" with provisions of governing contracts, including no-action clauses. Deer Park Rd. Mgmt. Co., LP v. Nationstar Mortg. LLC, 233 AD3d 564, 565 (1st Dept. 2024). New York courts "read a no-action clause to give effect to the precise words and language used, for the clause must be 'strictly construed.'" Quadrant Structured Prods. Co. v. Vertin, 23 NY3d 549, 560 (2014) (citations omitted). It is "well settled" law that "no-action clauses . . . are strictly enforced where applicable." Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc., FSB, No. 654397/2017, 2018 WL 1947405, at *6 (NY Sup. Ct. NY Cnty, April 25, 2018) ("J. Crew"), aff'd, 171 AD3d 626 (1st Dept. 2019). "An agreement to be bound by such a 'collective design' applies where . . . litigation decisions are to be made by a designated Administrative Agent that must act at the direction of contractually defined Required Lenders, even where there is a risk of 'potentially unequal treatment.'" Id. at *13 (quoting Beal Sav. Bank [*11]v. Sommer, 8 NY3d 318, 321—32 (2007). Where a no-action clause is present in a credit agreement that cedes authority to the administrative agent, "litigation decisions . . . [must] be made by a designated Administrative Agent." Id. Lenders' agreement to similar provisions in lending documents indicates that the syndicate participants agree to "be bound" by a "collective design" that precludes litigation claims initiated by a single plaintiff. Id. 
However, compliance with the no-action clause is excused when demand futility requires that a party "commence an action against itself." BlackRock Balanced Cap. Portfolio (FI) v. U.S. Nat'l Ass'n, 165 AD3d 526, 528 (1st Dept. 2018); Commerzbank AG v. U.S. Bank, N.A., 100 F.4th 362, 375—76 (2d Cir. 2024). A no-action clause requiring parties to bring their claims to the trustee will not bar litigation against the trustee itself because "it would be absurd to require the debenture holders to ask the Trustee to sue itself." Cruden v. Bank of New York, 957 F.2d 961, 968 (2d. Cir. 1992). Plaintiffs establish that demand upon Antares Capital to enforce their rights under the Agreement would have been "futile" because Antares is a named defendant and because Antares is alleged to have participated in the Scheme along with STG and the Defendant Lenders—including the Antares Lenders. "Any claims that Antares would bring against the defendant lenders and STG would necessarily implicate its own liability not just as an agent but as a participating defendant lender." 8/12/25 Tr. 60:15—26, 62:10—15 (citing AC at ¶¶ 10, 11, 71—73, 84—87, 159—60, 236, 238 for allegations as to Antares' conflicts of interest as Agent). 
The Court finds Commerzbank to be instructive. In Commerzbank, the Second Circuit extended the holding of Cruden to other parties with "close relationships with the breaching entities" and who are "directly implicated in the wrongdoing." Commerzbank, 100 F.4th at 375. Commerzbank instructs "courts determining whether a [no-action clause] requires pre-suit demands . . . [to] consider whether such requirements would entail potential conflicts of interest on the demanded party, and if so, whether the nature and extent of the conflicts would indicate that these parties would be sufficiently unlikely to bring claims if asked to do so, such that the demand would be futile." Id. at 375—76. Notably, on remand, the trial court determined that pre-suit demand on Citibank was futile because Citigroup—an affiliate of Citibank—was the breaching trust administrator and custodian, and its affiliate was a breaching sponsor. Commerzbank A.G. v. U.S. Bank Nat'l Ass'n, No. 16-CV-4569, 2024 WL 5089017, at *4 (S.D.NY Dec. 12, 2024). Accordingly, these affiliates "were directly implicated in the wrongdoing alleged . . . ." Id.
Defendant Lenders' argument that demand futility would apply only to Antares Capital, and not to Defendant Lenders or STG, is therefore without merit as Antares Capital is alleged to have participated in the Scheme. See Def. Lenders Reply at 5 (citing Deer Park, 233 AD3d at 565). Taking the factual allegations as true, Antares Capital was far from a neutral Administrative Agent with the capacity to assess the merits of Plaintiffs' claims and decide whether to sue on behalf of the lending group. AC at ¶¶ 10, 11, 71—73, 84—87, 159—60, 236, 238. 
Because Plaintiffs sufficiently allege that Antares Capital—to whom the parties had delegated litigation decisions—is implicated in the Scheme and conflicted, Defendants' arguments that the collective design of the Agreement also fail. Defendants rely upon J. Crew where, as here, a no-action clause in a syndicated lending credit agreement barred the plaintiff lenders from initiating claims without the consent of the administrative agent. The failure of the plaintiffs in J. Crew to make a demand upon the administrative agent prior to filing an action resulted in a dismissal of all claims where making such a demand was a predicate for [*12]establishing standing. 2018 WL 1947405, at *6. Defendants also cite to Antara for the proposition that Plaintiffs lack standing to initiate this litigation. Antara Cap. Master Fund LP v. Bombardier, Inc., No. 650477/2022, 2023 WL 2566166 (NY Sup. Ct. NY Cnty, March 17, 2023). Both cases are inapposite, as neither case addressed allegations as to the agent's alleged bad faith, gross negligence, or willful misconduct. See infra at Section VI. Specifically, in Antara, the court determined that the amended complaint did not allege "particularized facts to suggest demand futility, including that the Trustee could face exposure for its own breach . . . ." Antara, 2023 WL 2566166, at *14. Absent a "non-exculpated act," a plaintiff "ha[s] no basis to contend that the [agent] could not have impartially considered a demand for permission to sue." Id. at **12—14. Here, by contrast, Plaintiffs have sufficiently alleged a non-exculpated act.
Accordingly, the Court determines that Plaintiffs have standing to commence this action.
II. Declaratory Judgment (Count I)
Plaintiffs seek a declaration that the SAA is not a valid and enforceable contract. Section 10.1(a) of the FAA requires the written consent from lenders "directly and adversely affected" by any "waiver, amendment, supplement (including any additional Loan Document) or consent" that "postpones interest payments, reduces the principal amount of any Loan, alters the priority or pro rata treatment of Loans, releases substantially all collateral backing the Loans, and/or subordinates lenders' existing Loans or liens securing these Loans to other loans or liens." AC at ¶ 143. Plaintiffs assert that because neither they, nor the Minority Lenders, gave their required consent to execute the SAA under Section 10.1(a), the SAA is invalid and unenforceable, and therefore void. Id. at ¶ 154.
Defendants seek to dismiss the claim for declaratory judgment based upon four general grounds: (1) the claim is duplicative of the breach of contract claims; (2) equitable relief is unavailable where Plaintiffs have adequate damages remedies for any alleged breach of contract; (3) the Sixth Amendment was validly adopted without Plaintiffs' consent; and (4) Plaintiffs do not allege any amendment to a sacred rights provision. 
"A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion. A contract is ambiguous if 'on its face [it] is reasonably susceptible of more than one interpretation.'" Telerep LLC v. U.S. Intern Media LLC, 74 AD3d 401, 402 (1st Dept. 2010) (internal citations omitted). When determining the ambiguity of a contract, courts "should view the obligation as a whole and the intention of the parties as manifested thereby." Duane Reade, Inc. v. Cardtronics, LP, 54 AD3d 137, 141 (1st Dept. 2008) (internal citation omitted). Dismissal of a claim predicated on an alleged breach is therefore inappropriate if a court determines that the contract is ambiguous and cannot be construed as a matter of law. Telerep, 74 AD3d at 402.
A. Plaintiffs Allege that the Scheme Constituted an Integrated Transaction
Underpinning Plaintiffs' cause of action is the notion that the Scheme constituted "a single integrated transaction"—that is, the simultaneous execution of the SAA, the Dropdown Agreement, and Intercompany Agreement and the attendant, interrelated steps as alleged in the Amended Complaint, intended to "eviscerate protections for the [Minority] Lenders," AC at ¶ 41, Sec. B and ¶ 144; see also id. at ¶¶ 11, 87, 102—103, 108. Defendants argue that these steps and execution of agreements comprised a lawful "series of independent steps" made through "separate agreements." Def. Lenders Mem. of Law at n. 9. Defendants claim that "[n]othing in the [SAA] actually amended a sacred rights provision" and that "only provisions that could be [*13]amended with majority consent were touched" in adoption of the SAA. 8/12/25 Tr. 17:9—16. 
New York courts consider multiple factors when determining whether a transaction is integrated, and "form is not conclusive" with respect to entering into agreements with single versus separate assents. Rudman v. Cowles Commc's, Inc., 30 NY2d 1, 13 (1972). "Whether the parties intended to treat [ ] [the] agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact." Id. In determining whether contracts are separable or treated as one, the "primary standard is the intent manifested, viewed in the surrounding circumstances." Id. Contracts that are "executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument." BWA Corp. v. Alltrans Express U.S.A., Inc., 112 AD2d 850, 852 (1st Dept. 1985). 
Plaintiffs sufficiently allege that the SAA, the Dropdown Agreement, and the Intercompany Agreement had the same purpose, were executed at the same time, and are mutually dependent. Defendants do not dispute their reliance on the interconnection of all three contracts to execute the October Transaction. Additionally, the Court cannot determine at this juncture the intent of the parties when entering into the three contracts; however, absent the authority of any one of the three at-issue contracts, the October Transaction would fail. Accordingly, for purposes of this Motion, the Court reads and interprets the three contracts as one instrument as alleged by Plaintiffs.
B. Plaintiffs' Approval of the SAA and Breach of "Sacred Rights" Provisions
Plaintiffs sufficiently plead that the amendments to the FAA implicated their sacred rights under Sections 10.1(a)(ii), (iii), (iv)(A), (vii), and (viii), and therefore the SAA is void. The FAA requires consent of Plaintiffs, as directly and adversely affected lenders, to validly execute the SAA if a sacred right is implicated. Therefore, the breach of a single sacred right is sufficient to invalidate the SAA pursuant to the plain language of Section 10.1 (which requires consent of all lenders "directly and adversely affected" by the enactment of "one of the results enumerated under Section 10.1"). AC at ¶ 104 (emphasis added). Defendants argue that amendments to the sacred rights provisions occur only if a change is directly made to the sacred rights provisions within Section 10.1(a), and not where textual changes are made to provisions other than Section 10.1(a) that "impact the protections in Section 10.1(a)." STG Mem. of Law at 11—12 (emphasis added). Defendants rely on Ocean Trails CLO VII v. MLN Topco Ltd., 233 AD3d 614, 615 (1st Dept. 2024) ("Mitel") for the proposition that "amendments otherwise permitted under the express terms of the Credit Agreement . . . cannot support a 'sacred rights' claim even if these amendments are alleged to 'effectively' impact Plaintiffs." Id. at 12 (emphasis in original). However, in the instant case, textual changes were made to Sections of the FAA in contrast to the unchanged credit agreement in Mitel. Defendants' narrow reading of Section 10.1(a) makes it ambiguous at best. For the reasons set forth herein, Plaintiffs sufficiently allege violations of multiple, specific sacred rights provisions. 
Plaintiffs allege a violation of their sacred right to receive their entitled pre-maturity interest payments under Section 10.1(a)(ii) because the Majority Lenders amended Section 8.1, granting STG unilateral discretion to avoid any scheduled interest payments until maturity without triggering a default. Id. at ¶¶ 105—06, 146. Plaintiffs further allege that "an interest payment is only fixed and due on a particular date if it is not discretionary." 8/12/25 Tr. 68:13—15. Although Plaintiffs currently receive interest payments, they do so only at the will of STG. This alleged violation impacts the reasonable expectation of Plaintiffs when investing in [*14]these loans to receive a specified stream of cash flow on specific dates. Plaintiffs lost all contractual remedies to declare an event of default for missed interest payments during the life of the loan because instead of the contractually required quarterly payments in the original loans, the only fixed payment date in the UnSub loans is the 2028 maturity date. Id. at 68:3—21. Additionally, the elimination of an event of default for missed interest payments prohibits lender intervention and potential restructuring if the financial condition of STG continues to deteriorate and they fail to make the voluntary quarterly interest payments.
Plaintiffs also allege a violation of their sacred right prohibiting other loan parties from pre-paying existing loans in a non-pro-rata loan exchange, thereby reducing the principal of outstanding loans. Plaintiffs allege the loans of the Majority Lenders were "cancelled by Antares, thereby reducing the principal of their Loans to zero" and these loans were replaced by newly issued loans that deprived Plaintiffs of their right to ratable treatment in violation of Sections 2.7, 2.8, 10.1(a)(iii), and 10.1(a)(iv)(A). Id. at ¶¶ 108, 147. Defendants, however, claim that the non-pro-rata transaction is not a "loan cancellation," but is a permitted "discounted buyback" transaction. Def. Lenders Mem. of Law at 18. Pursuant to FAA Section 2.7(d), discounted buybacks are permitted by use of "internally generated funds." Defendants posit that cash proceeds of loans made to UnSub, and subsequently transferred to STG, "qualify as being 'internally generated.'" Id. Defendants narrow their view to only one stage of the transaction—the internal movement of cash from UnSub to STG. Plaintiffs, however, succeed in alleging contractual ambiguity, and therefore a disputed fact pattern, by alleging that a "discounted buyback" is "intended to benefit all lenders by allowing the company to deleverage and retire debt when it had cash to spare," and is a term inapplicable to this transaction. 8/12/25 Tr. 52:5—7.
Plaintiffs sufficiently allege that STG transferred existing loan collateral to two newly created unrestricted subsidiaries in violation of Sections 6.2, 6.3, 6.6, 6.18, and 10.1(a)(vii). AC at ¶¶ 109—10. Plaintiffs allege that the two key business segments transferred from STG to UnSub constituted "substantially all of STG's collateral backing the Loans." Id. at ¶¶ 110, 148. Plaintiffs pleaded the breach of a sacred right because the Scheme involved the transfer of collateral to UnSub that effectively released it from the collateral pool available to Plaintiffs. NYSCEF Doc. No. 153 at 35—36 (Pl. Opp'n). Plaintiffs further assert that no mechanism existed in the FAA that would permit a release of collateral from STG to UnSub. 8/12/25 Tr. 77:2—6. Although Defendants argue that the textual amendments to the FAA did not directly impact terms permitting the transfer of collateral, they acknowledge the three individual contracts in the aggregate did impact, and allow for, the collateral transfer. Def. Lenders Mem. of Law at 21—23. Given the Court's reading of the three contracts as unified, Defendants' arguments fail because actions of Defendants pursuant to the Dropdown Agreement and the Intercompany Agreement did violate sacred rights in the FAA.
Finally, Plaintiffs allege that their existing loans, previously secured by first-priority liens on collateral, were subordinated when the UnSub loans received a higher senior secured priority in the collateral than Plaintiffs' loans in violation of Sections 2.7(d)(i) and 10.1(a)(iv)(A). AC at ¶¶ 110, 112, 116—17, 152. Plaintiffs and Defendants offer contradictory interpretations of the undefined term "subordinate" in the FAA. Pl. Opp'n at 39; STG Mem. of Law at 21. Plaintiffs assert that their loans were subordinated by the Scheme when their original liens became lower in priority than the new liens securing the UnSub loans. These new liens denied Plaintiffs collateral support for their loans from the assets transferred from STG to UnSub, and the loss of [*15]the guarantors on the original loans when they were exchanged for UnSub loans. Plaintiffs assert a textbook case of subordination because all lenders originally shared in the collateral on an equal and pro-rata basis, but after the Scheme, Defendants' loans to UnSub had improved collateral priority over the now-subordinated loans of Plaintiffs. AC at ¶¶ 117, 152; Pl. Opp'n at 38. Plaintiffs further argue that Section 10(a)(iv)(A) is drafted broadly and not only covers changes to the FAA but also covers changes that have "the effect of changing the priority or pro-rata treatment of any payments." 
In contrast, STG argues that Plaintiffs' liens were "not subordinated at all" and were supported by a "pari passu first-lien guarantee on the Collateral." NYSCEF Doc. No. 157 at 18 (STG Reply). STG asserts that the structural subordination, as it allegedly exists, was not part of any amendment to the credit agreement and therefore is not actionable. Id. Defendant Lenders proffer a third reasonable interpretation of "subordination." They concede that "certain creditors [had] primary rights to UnSub's assets, which must be satisfied before Plaintiffs [] can access the value of those assets." Def. Lenders Mem. of Law at 22. However, Defendant Lenders present a highly technical analysis of the October Transaction to assert that Plaintiffs' liens themselves were not subordinated, but the asset transfer from STG to UnSub resulted in structural subordination that was not prohibited under the loan documents. Id. Defendant Lenders ground this theory in their interpretation of Section 10.1(a)(viii) which requires consent of directly and adversely affected lenders for an amendment that "subordinates the Liens." Id. at 21 (emphasis added). Because the language of Section 10.1(a)(viii), and specifically the definition and application of "subordinate," is susceptible to two—possibly three—commercially reasonable interpretations, the Court declines to dismiss Plaintiffs' claim.
C. Plaintiffs' Request for Equitable Relief
Defendants argue that Plaintiffs' request for declaratory judgment should be denied because monetary damages constitute a sufficient remedy to redress any losses arising from the alleged breaches of contract. Defendants further argue that the request for equitable relief is duplicative of the breach of contract claims in the Amended Complaint. Additionally, because STG is a going concern, and still an operating company, it is impractical—if not impossible—to unwind the numerous individual transactions that occurred after adoption of the SAA, including changing the existing capital structure. Id. Plaintiffs allege that neither monetary relief, nor a ruling on the breach of contract causes of action, will provide an adequate remedy to resolve this dispute. Pl. Opp'n at 58—60. Plaintiffs assert their request for a declaratory judgment will establish finality with respect to whether the FAA or SAA governs. Id. 
A claim for declaratory judgment is nonviable where it is "unnecessary and inappropriate [because] plaintiff[s] ha[ve] an adequate, alternative remedy in another form of action, such as breach of contract." Apple Recs., Inc. v. Capitol Recs., Inc., 137 AD2d 50, 54 (1st Dept. 1988). "Courts frequently find that a declaratory judgment will not serve a purpose when the claim is duplicative of another claim in the same action." MSR Tr. v. Nationstar Mortg. LLC, No. 21-cv-3089, 2022 WL 3441613, at *12 (S.D.NY July 28, 2022). Equitable relief is also nonviable when "it appears to be impossible or impracticable." Sahu v. Union Carbide Corp., 418 F. Supp. 2d 407, 411—12 (S.D.NY 2005).
The Court determines that the breach of contract claims will not settle the open issue as to whether the FAA or the SAA is the operative loan document. The declaratory judgment cause of action is forward-looking and cements clarity as to current and future rights and responsibilities of the loan parties. Although many LMT court actions occur post-bankruptcy [*16]and involve defaulted loans, this transaction impacts an operating company with performing loans. In comparison, the breach of contract claims hinge on past actions. Additionally, the request for declaratory judgment is pleaded against all Defendants compared to the eight breach of contract claims that are pleaded only as to STG, and the two breach of contract claims that are pleaded only as to STG and Antares. Further, Defendants' speculation that it is impossible or impracticable to unwind the October Transaction is premature. This inquiry necessarily involves fact discovery and potentially expert testimony to assess the practicality and advisability of unwinding the October Transaction.
Accordingly, the Court denies the Motions to Dismiss the declaratory judgment claim by Defendants STG, Defendant Lenders, and Antares because it is not duplicative of the breach of contract claim. Further, issues of contractual ambiguity exist with respect to alleged violations of sacred right provisions, as discussed supra, and therefore requires, as a matter of law, the Court to deny the Motions at this juncture.
III. Breach of Contract (Counts II—XI)
Plaintiffs allege ten separate breach of contract causes of action in Counts II—XI. AC at ¶¶ 155—240. Each breach of contract claim in the Amended Complaint is pleaded as a violation of one or more sections of the FAA, specifically, Sections 2.10(a), 6.1, 6.2, 6.3, 6.5, 6.6, 6.18, 2.7, 2.8(d), and 2.10(c). Each breach of contract claims turns on whether the FAA or the SAA was the governing agreement (see n.5 supra). The Court has determined, pursuant to its ruling on the declaratory judgment claim, that Defendants have not established that the SAA was operative. Accordingly, Defendants STG's and Antares' Motions to Dismiss the breach of contract claims are denied.
IV. Breach of Implied Covenant of Good Faith and Fair Dealing (Count XII)
Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing in the alternative, only if this Court determines that the "[FAA] granted Defendants the discretion to enter into the [SAA]" without Plaintiffs' consent. AC at ¶ 242. Plaintiffs allege that they "reasonably expected" their loans, as first-lien obligations, would receive "equal and fair treatment" in any future amendments, particularly when the amendments designed to protect lenders against an LMT were drafted into the FAA and executed a mere five months before the October Transaction. Id. at ¶¶ 16, 61, 91, 243. Plaintiffs allege that—even if the SAA was lawfully adopted—Defendants conspired to execute the Scheme with the intent to strip Plaintiffs of recently-added lender protections that violated Plaintiffs' reasonable expectations against "an abusive dropdown LMT that would structurally subordinate Plaintiffs through the use of unrestricted subsidiaries." Id. at ¶¶ 243, 245.
Defendants offer three arguments in opposition: (1) this claim should be dismissed as duplicative of Plaintiffs' breach of contract claims; (2) Plaintiffs impermissibly seek to impose entirely new terms in the Agreement; and (3) the alleged conduct is expressly permitted by the Agreement. STG Mem. of Law at 20—21; Antares Mem. of Law at 20; see also Tr. 8/12/25 at 36:13—18 ("[E]very action challenged by plaintiffs here was undertaken pursuant to specific provisions in the credit agreement . . . ."). Defendants rely on the First Department's ruling in Mitel which held that the implied covenant is not a vehicle for the creation of new contractual terms where sophisticated parties negotiated precise terms. If the parties in Mitel wanted to prohibit amendments such as those at issue here, "they could have done so, but they did not." Mitel at 617.
"In New York, all contracts imply a covenant of good faith and fair dealing in the course [*17]of performance." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 NY2d 144, 153 (2002) (internal citations omitted). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Id. (internal citations omitted). A claim for breach of the implied covenant warrants dismissal where such a claim arises from the same operative facts and seeks the same damages as a cause of action for breach of contract. Mill Fin., LLC v. Gillett, 122 AD3d 98, 104—105 (1st Dept. 2014). A breach of the implied covenant claim, however, is not duplicative of a breach of contract claim where the complaint alleges conduct that is separate from the conduct constituting the alleged breach of contract and such conduct deprived the other party of the benefit of its bargain. Credit Agricole Corporate v. BDC Fin., LLC, 135 AD3d 561, 561 (1st Dept. 2016). Pleading a breach of the implied covenant claim in the alternative to a breach of contract claim is further permissible "when there is a bona fide dispute over whether a contract covers the contested issue." LCM XXII Ltd. v. Serta Simmons Bedding, LLC, No. 21 CIV. 3987 (KPF), 2022 WL 953109, at *15 (S.D.NY Mar. 29, 2022).
Plaintiffs sufficiently allege facts and conduct in support of their claim for breach of the implied covenant that are distinct from their breach of contract claims. Even if the SAA is deemed to be operative, Plaintiffs allege that Defendants acted in bad faith by secretly conspiring to execute the Scheme, which fundamentally undermined the bargained-for lender protections that the parties agreed to in the FAA. See, e.g., AC at ¶¶ 9—11, 16, 82, 103, 144. Plaintiffs assert that they were denied the "fruits of their bargain" by the "draconian" actions taken by Defendants in executing the Scheme, whereby Defendants did not have to "bear the consequences" of the LMT after adoption of the SAA as Plaintiffs did. Id. at ¶¶ 244—45. Accordingly, Plaintiffs' allegations here do not arise from the same operative facts as those in support of the breach of contract claims, nor do Plaintiffs seek a "gap-filler" intending to re-write the contract or insert language that the lenders, in retrospect, should have included. For these reasons, the Court distinguishes the instant facts from those in Mitel: here, the crux of Plaintiffs' allegations are that Defendants' amendments to the FAA flew in the face of their reasonable expectations of negotiated lender protections in the FAA in contrast to Mitel, where the parties did not specifically negotiate amendments to prohibit the contested transaction.
The Court finds the decisions in AEA Middle Market and Boardriders to be instructive: both cases involved allegations, like those here, that the defendants acted in secret to execute a transaction that undermined the plaintiffs' reasonable economic expectations under the operative agreements. AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC, 214 AD3d 111 (1st Dept. 2023); ICG Global Loan Fund 1 DAC v. Boardriders, Inc., No. 655175/2020, 2022 WL 10085886, at *9 (NY Sup. Ct. Oct. 17, 2022). In AEA Middle Market, the First Department held that allegations of "bad faith conduct in conspiring to manufacture a restructuring process that deprived plaintiffs of the benefit of their bargain under the terms of the Credit Agreement" were sufficient to defeat dismissal of plaintiffs' good faith and fair dealing claims. 214 AD3d at 133—34. The court further held that because the plaintiffs sought redress for violations of their "reasonable expectations" under the credit agreement, the implied covenant claims were not contradicted by the essential terms of the agreement. Id. at 134. In Boardriders, the court sustained the breach of implied covenant claim based upon similar allegations that the "[t]ransaction was carried out in secret" while "plaintiffs made multiple attempts to gauge whether the Company needed additional capital, which plaintiffs allege they were willing to provide." 2022 WL 10085886, at *9; cf. AC at ¶¶ 10 ("Plaintiffs found it [*18]increasingly difficult to obtain any information from Antares (the lenders' Agent under the Credit Agreement), the Equity Sponsors, or the company regarding STG's financial status or the Equity Sponsors' plans for addressing STG's continuing liquidity issues"), 84 ("Plaintiffs and other Minority Lenders made numerous inquiries to Antares, Wind Point, Oaktree, and STG itself about the company's liquidity needs and any contemplated refinancing plans"). 
Accordingly, the Court denies the Motions to Dismiss Count XII by Defendants STG, Defendant Lenders, and Antares. The allegations are sufficient to allege that Defendants colluded in secret and in bad faith to deprive Defendants of their reasonable expectations and fruits of their bargain—i.e., pro rata treatment of their loans.
V. Violation of New York Uniform Voidable Transactions Act (Count XIII)
Plaintiffs allege that Defendants STG and UnSub violated Section 273(a)(1) of New York's Uniform Voidable Transaction Act (UVTA) by transferring valuable STG business segments to UnSub with the "actual intent to hinder, delay, or defraud the Minority Lenders." AC at ¶¶ 253—55. Plaintiffs further allege that STG and UnSub violated Section 273(a)(2)(i) because "STG did not receive reasonably equivalent value for the transfer of its valuable business segments to UnSub," but instead received a "nominal amount of the Defendant Lenders' Loans that were prepaid in exchange for new UnSub Loans." Id. at ¶¶ 256—257. Plaintiffs assert that the Scheme to transfer valuable assets from STG to UnSub without receiving reasonably equivalent value, and the incurrence of additional obligations to STG, constitute fraudulent transfers in violation of Sections 273, 276, and 276-A of the UVTA, and are therefore voidable and should be unwound. Id. at ¶ 260. 
STG Defendants argue that the UVTA claim fails because alleged violations of New York law do not apply to the October Transaction. STG Mem. of Law at 21. Plaintiffs rebut that the broad choice-of-law provision at Section 10.16(a) of the Agreement (which is unchanged in the FAA and SAA, and specifies New York Law) is sufficient to encompass tort claims. Pl. Opp'n at 46—47. The provision states that "[t]he laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement." FAA at §10.16(a); SAA at §10.16(a).
The UVTA replaced the former Uniform Fraudulent Conveyance Act ("UFCA") and became effective on April 4, 2020, thereby governing all transactions on or after that date. One of the key changes from the UFCA is the inclusion of Section 279, which provides clear guidance on the law applicable to an avoidance transaction. Section 279 prescribes that "a claim for relief . . . is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred," and if the debtor has more than one place of business, it "is located at its chief executive office." Because the Amended Complaint alleges that STG's principal place of business is in Illinois, AC at ¶ 25, New York law does not apply. See Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd., 676 F. Supp. 3d 233, 256 (S.D.NY 2023) ("[T]he UVTA's use of the debtor's location at the time of the transfer—and not inviting arguments as to the effect of contractual provisions whose application may be debatable—has the virtue of putting in place a 'clear rule' that 'eliminates the risk that the laws of multiple jurisdictions might be applicable to a single transfer involving property in multiple jurisdictions or injuring creditors in multiple jurisdictions.'" (internal citations omitted)); see also id. at 256 n.12 ("[T]he UVTA 'minimizes unnecessary litigation regarding choice of law rules.'" (quoting Guide to New York's Uniform Voidable Transactions Act, Practical Law Practice Note w-030-0994)).
Plaintiffs argue that, notwithstanding the clear statutory language of Section 279, the parties agreed to a sufficiently broad choice-of-law provision that would encompass causes of action sounding in tort and thereby overcome the mandatory jurisdictional requirement of Section 279. Plaintiffs compare the language of the choice-of-law provision here to those that have been construed to apply to claims that sound in tort. See Avnet, Inc. v. Deloitte Consulting LLP, 133 N.Y.S.3d 553, 556 (1st Dept. 2020) (holding that choice-of-law provision stating "and all matters relating to this Agreement and each Work Order, shall be governed by . . . the laws of the State of New York (without giving effect to the choice of law principles thereof)" was sufficiently broad to cover a negligence claim); Cap. Z Fin. Servs. Fund II, L.P. v. Health Net, Inc., 840 N.Y.S.2d 16, 23 (1st Dept. 2007) (holding that choice-of-law provision stating that Delaware law governed "all issues" concerning "enforcement of the rights and duties of the parties" applied to extra-contractual claims).
Plaintiffs' cited authority, however, does not stand for the proposition that parties may privately agree to override or circumvent the UVTA's jurisdictional requirements. See Frontier Airlines, 676 F. Supp. 3d at 256 ("First, '[t]he mere fact that an agreement, and disputes arising thereunder, are governed by the law of a particular jurisdiction does not transform all statutory requirements that may otherwise be imposed under that body of law into contractual obligations.'" (quoting Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC, 31 NY3d 1002, 1007 (2018))). Plaintiffs' attempt to distinguish Frontier based on a separate and distinct reason articulated by the decision—that the defendants were not parties to the agreement—is therefore unpersuasive. Id. at 255—256 (citing "multiple reasons" why New York law did not apply).
Accordingly, STD Defendants' Motion to Dismiss Count XIII of the Amended Complaint is granted.
VI. Exculpation of Antares Capital LP as Agent (Counts I, II, XI, XII)
Antares Capital denies liability with respect to actions taken in its capacity as Administrative Agent. It argues that the contractual role of the Agent is "entirely administrative in nature." Antares' Mem. of Law at 4; FAA at § 9.1(c); SAA at § 9.1(c). The Agreement provides broad general exculpation provisions applicable to any agent action "taken or omitted to be taken . . . under or in connection with any Loan Document." Antares' Mem. of Law at 5. However, the exculpation clause does not apply where Plaintiffs identify "gross negligence or willful misconduct" on the part of Antares Capital that is the primary source of the liability. Id. at 12; FAA at § 9.5(a); SAA at § 9.5(a). All parties waived and agreed not to assert "any right, claim, or cause of action based thereon except to the extent of liabilities resulting primarily from gross negligence or willful misconduct." FAA at § 9.5(a); SAA at § 9.5(a); 8/12/25 Tr. 39:20—24. 
Plaintiffs allege Antares' "gross negligence" and/or "willful misconduct" through the participation of Antares Capital in the Scheme. Pls. Opp'n at 48—49; 8/12/25 Tr. 60:15—26. Specifically, Plaintiffs allege that "Antares [Capital] engaged in intentional and conflicted conduct to effectuate the Scheme that was designed to harm the Excluded Lenders for the benefit of the Antares lenders and the other Defendant Lenders." Pls. Opp'n at 48; see also AC at ¶ 86 (Antares Capital "has signed a non-disclosure agreement in relation to a secret negotiation occurring among STG, the Equity Sponsors, and certain Defendant Lenders" and "abandoned the duty it owed to all lenders as Agent . . ." (emphasis in original)). 
"[G]ross negligence is 'conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" Greenapple v. Capital One, N.A., 92 AD3d 548, 550 (1st [*19]Dept. 2012) (quoting Colnaghi, USA v. Jewelers Protection Servs., Ltd., 81 NY2d 821, 823—24, (1993)). On a motion to dismiss a cause of action based on an exculpation clause with "gross negligence" and "willful misconduct" language, the court must deny the motion where, as here, Plaintiffs allege intentional participation in an unlawful scheme. Id. at 549 (allegations of the defendant's "intentional[ ] participation in the scheme" sufficiently alleged gross negligence to defeat exculpation on a motion to dismiss).
Defendant Antares' reliance on J. Crew is unpersuasive because, there, the plaintiff did not plead allegations suggesting the agent engaged in "gross negligence or willful misconduct," and the court determined that the agent's acceptance of a majority, rather than unanimous, vote in a credit agreement amendment may have amounted—at most—to ordinary negligence. J. Crew WL 1947405 at *5. Taking Plaintiffs' factual allegations as true (i.e., that Antares Capital entered an NDA with select lending parties, their non-responsive stance as to Plaintiffs' requests for STG's financial information, the potential for conflict between their role as Administrative Agent and their relationship with the Antares Lenders, and their collusion in the Scheme), Antares cannot evade liability under Section 9.5(a) at this stage. 
Accordingly, the Court denies Antares' Motion to Dismiss all claims against it in its capacity as Agent.
VII. Sentry's Motion to Dismiss (Counts I and XII)
Defendant Sentry argues that it should be dismissed from this action because it lacks liability for actions, decisions, or transactions related to the at-issue loans. In December 2013, Invesco began serving as Sentry's investment manager. Sentry Mem. of Law at 5—6. The parties entered into an Investment Management Agreement ("IMA") that granted Invesco "full power and authority to make and act upon all investment decisions with respect to [Sentry's] account." Id. at 6 (citing NYSCEF Doc. No. 66 at 4). Sentry refers to Invesco as a "non-servant agent" and claims their conduct cannot be imputed to Sentry for liability purposes. Id. at 4—5. Plaintiffs argue that by using a non-servant agent, Sentry is not liable for torts but is legally responsible for causes of action brought under contract law. Pl. Opp'n at 61. 
In New York, a principal is not "responsible for torts committed by a nonservant [sic] agent." Halpin v. Prudential Ins. Co. of Am., 48 NY2d 906, 908 (1979). However, a "disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his authority if made in proper form and with the understanding that the principal is a party." Restatement (Second) of Agency § 144 (1958). 
The legal authority upon which Sentry relies stands for the proposition that actions of a non-servant agent are not attributable to its principal as to tort liability. Sentry cites no legal authority for extending this principal to contractual liability. Sentry acknowledges it is "bound by the Credit Agreement" and does not dispute that Invesco had authority to "sign documents related to the Subject Loans on its behalf." NYSCEF Doc. No. 159 at 8 (Sentry Reply). Sentry further relies on arguments focused on "acts" and "wrong acts" by a non-servant agent. Id. at 6. However, these two causes of action (declaratory judgment and breach of the implied covenant of good faith and fair dealing) are rooted in contract law. Sentry received the benefits of the loan contracts (e.g. interest payments) and must also assume the liabilities of owning them. 
Accordingly, the Court denies Sentry's Motion to Dismiss Count I and Count XII.
***
The Court has considered the parties' remaining contentions and finds them to be unavailing.
Upon the foregoing, it is hereby
ORDERED that Defendant Lenders' Motion to Dismiss Counts I and XII of the Amended Complaint is DENIED (Motion 004); and it is further
ORDERED that Defendant Sentry's Motion to Dismiss Counts I and XII of the Amended Complaint is DENIED (Motion 005); and it is further
ORDERED that Defendant Antares' Motion to Dismiss Counts I, II, XI, and XII of the Amended Complaint is DENIED (Motion 006); and it is further
ORDERED that STG Defendants' Motion to Dismiss the Amended Complaint is GRANTED in part as to the dismissal of Count XIII, and DENIED in part as to the dismissal of Counts I—XII; and it is further
ORDERED that Defendants shall file their answers to the remaining claims of the Amended Complaint within twenty (20) days of the filing of notice of entry of this Decision and Order.
The foregoing constitutes the Decision and Order of this Court.
DATE January 3, 2026
ANAR RATHOD PATEL, A.J.S.C.

Footnotes

Footnote 1:See NYSCEF Doc. No. 14 at 5—7 (Amended Complaint, "AC") for complete list of "Defendants".

Footnote 2:The Amended Complaint names Antares Capital LP ("Antares Capital") in its capacity as Administrative Agent. AC at ¶ 26. Plaintiffs also name 16 Antares-related entities in their capacity as lenders ("Antares Lenders," together with Antares Capital, "Antares"). Id. at ¶ 27.

Footnote 3:"Defendant Lenders" are all lenders listed in the Complaint except for Sentry Insurance Company and the Antares Lenders. Sentry and Antares retained separate counsel and filed their own Motions to Dismiss (Mot. Seqs. 005, 006). Unless explicitly stated, the facts and allegations against Defendant Lenders incorporate Sentry and Antares Lenders. Sentry and the Antares Lenders join the arguments submitted by the Defendant Lenders. NYSCEF Doc. No. 123 at 6, n.1. (Antares Mem. of Law); NYSCEF Doc. No. 95 at 4. (Sentry Mem. of Law).

Footnote 4:This Decision and Order will refer to the "Agreement" where there is no material difference between the FAA or SAA as to the relevant term(s) referenced.

Footnote 5:In adopting the SAA, the Majority Lenders revised language present in the FAA by either (1) removing the entire section; (2) making a direct change to the text in the allegedly breached section; or (3) making a direct change to the text of a section referenced by the allegedly breached section that is material to determining whether a breach occurred. E.g., Section 2.10(c) provides that "[d]uring the continuance of an Event of Default . . . all payments received by the Agent . . . shall be applied" in an order specified within this Section. The text of Section 2.10 is unchanged in the SAA. Pursuant to Section 8.1(c) of the FAA, an "Event of Default" occurs upon any failure by a Credit Party to "perform or observe any term, covenant or agreement" reflected in Article VI. Plaintiffs allege that Events of Default occurred pursuant to Sections 6.1, 6.2, 6.3, 6.5, 6.6, and 6.18 of the FAA; however, each relevant section of Article VI containing those covenants is deleted in the SAA. Therefore, Plaintiffs claim that the failure of the Agent to make payments as specified in Section 2.10(c) constitutes a breach of contract under the FAA.

Footnote 6:The facts
are taken from the AC and are accepted as true for the purposes of the Motions to Dismiss.

Footnote 7:Measured from the quarter ending March 31, 2024, through the quarter ending September 30, 2025.

Footnote 8:This provision is intended to thwart drop-down transactions and is commonly known in credit agreements as a "J. Crew blocker." See Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc., FSB, No. 654397/2017, 2018 WL 1947405, at *6 (NY Sup. Ct. NY Cnty, April 25, 2018) ("J. Crew"), aff'd, 171 AD3d 626 (1st Dept. 2019).

Footnote 9:Although not defined in the FAA, a "sacred right", as used herein, refers to key lender protections in loan documents that require a super-majority or unanimous lender vote to remove or alter.

Footnote 10:Plaintiffs allege that although they were not consulted during FAA negotiations, the additional lender protections adopted in the FAA were purposely drafted with precise language to foreclose any future possibility of an LMT. AC at ¶¶ 8, 11.